



FILED

JUN 2 8 2006

CLERK

UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH DAKOTA
SOUTHERN DIVISION

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

| | | |
|---|---|---|
| ROBERT D. ZAVADIL, | * | |
| | * | CIV 04-4013 |
| Plaintiff, | * | |
| | * | **MEMORANDUM OPINION** |
| | * | **AND ORDER** |
| ALCOA EXTRUSIONS, INC., | * | |
| Defendant. | * | |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## FACTUAL AND PROCEDURAL BACKGROUND

In this diversity action, Plaintiff, Robert Zavadil, whose employment was terminated by Defendant, Alcoa Extrusions, Inc., filed his complaint for breach of contract based on Defendant's "Peer Review Policy and Procedures." This policy provides for Peer Review Panels which hear appeals involving the application of policies, procedures, established practices and work rules involving Defendant's employees. The Peer Review Panels "may review management's actions to ensure that the policy or practice was applied properly and consistently." If the Peer Review Panels determine that the policy or practice was not applied properly and consistently, they have the authority under the policy to "make appropriate remedies consistent with Company practice and/or policies." The peer review policy specifically provides that terminations are covered in the appeals to the Peer Review Panels and that the Peer Review Panels have authority to reinstate employees. Finally, the policy states that the decisions of the Peer Review Panels are final and binding.

When Plaintiff's employment was terminated on January 21, 2003, Plaintiff inquired whether he could appeal the decision to a Peer Review Panel. The Manufacturing Manager advised Plaintiff that he did not know if he could take such an appeal. Plaintiff then contacted and was advised by the Corporate Human Resources Manager that he could not appeal the termination

decision to a Peer Review Panel. In a letter dated January 25, 2003, Plaintiff requested a written explanation of why he was denied use of the policy. On March 24, 2003, Plaintiff received a response from Defendant's Vice President of People and Communications stating that the Peer Review Policy and Procedures could only be utilized by non-exempt salaried and hourly employees.

After Plaintiff brought this action, Defendant moved for dismissal, or in the alternative, for summary judgment, contending that South Dakota's at-will-employment doctrine precluded Plaintiff from bringing this action. This Court treated the motion as a motion for summary judgment, and denied the motion. In denying the motion for summary judgment, this Court concluded that the Employee Handbook, standing alone, did not create a "for cause only" agreement by containing a detailed list of exclusive grounds for termination. This Court also concluded that the Employee Handbook itself did not contain a mandatory and specific procedure which the employer agreed to follow prior to terminating an employee's employment. This Court further concluded that the disclaimers in the Employee Handbook, prior to the implementation of the subsequently-enacted Peer Review Policy and Procedures, would have been sufficient to reserve to Defendant the right to discharge an employee at will, and the exercise of that right would have been final. In denying Defendant's motion for summary judgment, however, this Court concluded that "through its Peer Review Policy and Procedures Defendant contracted to modify its statutory power to hire and fire at will to the extent that a discharged employee may utilize the policy and a Peer Review Panel may make a final and binding decision to reinstate an employee that was discharged by Management." *Zavadil v. Alcoa Extrusions, Inc.,* 363 F.Supp.2d 1187, 1193 (D.S.D. 2005 ).

The Peer Review Policy and Procedures states that it covers "all full-time employees of Alcoa Extruded Construction Products, Yankton, SD, who have completed their 90-day orientation period [excluding] the facility's General Manager and all Staff personnel." In footnote 2 to its initial summary judgment memorandum Defendant stated, "Alcoa will explain why the peer review policy did not apply to Zavadil, but those arguments, since they are not part of the complaint, are not appropriate for a motion to dismiss. Therefore, if necessary, those facts will be presented at the appropriate time." Doc. 9. The Court stated in its Memorandum Opinion and Order Re: Jury Trial (Doc. 57) that it did not, on the record before it, find the contract created by the Peer Review Policy and Procedures to be ambiguous on the issue of who is a covered employee. This Court also

2

observed that no evidence had been presented at that time to dispute that Plaintiff was an eligible employee for application of the Peer Review Policy and Procedures, or to dispute that Plaintiff was denied the right to utilize the Peer Review Policy and Procedures. The Court, therefore, allowed the parties 20 days from the entry of the Memorandum Opinion and Order Re: Jury Trial to submit briefs and any appropriate documentation on whether the Court should grant summary judgment in favor of the Plaintiff on the issues of whether the Peer Review Policy and Procedures applies to Plaintiff and whether Defendant breached the contractual right to utilize the Peer Review Policy and Procedures. Both Plaintiff and Defendant have submitted their briefs and supporting documents on their positions regarding these issues. In addition, Defendant has moved for summary judgment (Doc. 59) on the following grounds: (a) Plaintiff's complaint should be barred by the National Labor Relations Board's primary jurisdiction under the *Garmon* preemption doctrine; (b) Plaintiff should be barred from raising the issue that he was terminated for not being sufficiently anti-union under collateral estoppel principles; (c) Plaintiff cannot create any genuine issues of material fact that he was terminated for not being sufficiently anti-union if the *Garmon* preemption doctrine does not apply; (d) Plaintiff cannot create any genuine issues of material fact that Defendant Alcoa's policies were not applied properly and consistently; and (e) Defendant is entitled to summary judgment on the amount of damages Zavadil can receive if he prevails on the liability issues.

General Principles of Summary Judgment

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment shall be entered "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." In ruling on a motion for summary judgment, the Court is required to view the facts in the light most favorable to the non-moving party and must give that party the benefit of all reasonable inferences to be drawn from the underlying facts. *AgriStor Leasing v. Farrow*, 826 F.2d 732, 734 (8th Cir. 1987). The moving party bears the burden of showing both the absence of a genuine issue of material fact and its entitlement to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986).

I.
## WHETHER DEFENDANT, ALCOA EXTRUSIONS, INC., IS ENTITLED TO SUMMARY JUDGMENT BASED ON *GARMON* PREEMPTION OR COLLATERAL ESTOPPEL?

Defendant maintains that since Plaintiff has contended that his employment was terminated for Plaintiff having not been sufficiently anti-union, and since this contention involves conduct which is arguably protected by the National Labor Relations Act (NLRA), Plaintiff's complaint is preempted by the NLRA and Defendant is entitled to summary judgment on this basis. When Plaintiff's employment was terminated, Defendant's manufacturing manager advised Plaintiff that his employment was being terminated because he had committed a safety violation and because he had talked with other shift supervisors about wages. Plaintiff has contended that his termination was based on upper management's perception of Plaintiff supporting the United Steelworkers Union's efforts to organize employees at Defendant's Yankton Plant. In fact, Plaintiff filed a charge with the National Labor Relations Board contending that Defendant committed an unfair labor practice by wrongfully discharging him "for not being sufficiently anti-union as a shift supervisor and for not suppressing his employees from joining or organizing a union." In correspondence dated September 4, 2003, Plaintiff was advised that as a supervisor Plaintiff did not have the same rights under the National Labor Relations Act that non-supervisory employees would have, but that it would be unlawful for his employer to discharge him for refusing to do an act which violates the labor law if he were requested to do that act by his employer.[1] Plaintiff was further advised that the Regional Director of the National Labor Relations Board had concluded that there was insufficient evidence to support the claim that he was terminated in violation of the law, and that Plaintiff would have the opportunity to withdraw his charge. Plaintiff subsequently withdrew the charge from the National Labor Relations Board.

Under the *Garmon* preemption doctrine, based on the Supreme Court's decision in *San Diego Bldg. Trades Council v. Garmon*, 359 U.S. 236 (1959), state regulations and causes of action are presumptively preempted if they concern conduct that is actually or arguably either prohibited

---

[1] If the discharge of a supervisor interferes with, restrains or coerces non-supervisory employees in the exercise of their organizational rights, the supervisor may be entitled to reinstatement under the National Labor Relations Act. *See Russell Stover Candies, Inc., v. National Labor Relations Board*, 551 F.2d 204 (8th Cir. 1977).

or protected by the NLRA. A state regulation or cause of action, however, will not be preempted if the behavior to be regulated is behavior that is of only peripheral concern to the federal law or touches interests deeply rooted in local feelings and responsibility[2]. *See generally*, Ann K. Wooster, J.D., Annotation, *Construction and Application of Garmon Preemption Doctrine by Federal Courts*, 2003 A.L.R. Fed. 1 (2003).

Defendant contends that the issue involving *Garmon* preemption is controlled by the Eighth Circuit's decision in *Platt v. Jack Cooper Transport, Co., Inc.*, 959 F.2d 91 (8th Cir. 1992). In the *Platt* case, after the employee's employment was terminated, the employee's union instituted a grievance for him under the union's collective bargaining agreement with the employer, claiming that the employee was not terminated for cause. After the grievance hearing, the employee's discharge was upheld under the collective bargaining agreement. The employee then filed a charge with the National Labor Relations Board alleging that his employer fired him because of union and protected concerted activities. The NLRB Regional Director declined to issue a complaint and the NLRB General Counsel denied the employee's appeal because of insufficient evidence to establish a connection between the union activities and the discharge. The employee then filed an action in federal district court contending his discharge violated California law which prohibited discharge for making safety complaints. The district court applied NLRA preemption because the employee's safety complaints were covered by or arguably covered by various provisions of the collective bargaining agreement, and the resolution of the state law claims would require interpretation of the collective bargaining agreement. *Id.* at 93.

In affirming the district court, the Eighth Circuit Court of Appeals noted that preemption turns on the nature of the conduct in question, not on the way it is pleaded. *Platt v. Jack Cooper Transport, Co., Inc.*, 959 F.2d at 94. The Eighth Circuit quoted *National Labor Relations Board v. City Disposal Systems, Inc.*, 465 U.S. 822, 841 (1984), for the proposition that protected concerted activity under Section 7 of the National Labor Relations Act includes "'an individual employee's reasonable and honest invocation of a right provided for in his collective-bargaining agreement.'" *Platt*, 959 F.2d at 94. The Eighth Circuit concluded that the employee's safety complaints were

---

[2]The National Labor Relations Act, 29 U.S.C. §§ 151 *et seq.*, contains no express preemption provision.

grounded in part upon his rights under the collective bargaining agreement, and that the threshold test for *Garmon* preemption  was thus satisfied. The Eighth Circuit concluded that the employee could have brought to the National Labor Relations Board the specific claim that he asserted in the lawsuit, and that no exception to the *Garmon* preemption rule applied to the facts of the case. *Platt*, 959  at 95.

The *Platt* decision does not control the case at hand. The fact that the Regional Director of the National Labor Relations Board had concluded that there was insufficient evidence to support the claim that Zavadial was terminated in violation of the NLRA does not alone satisfy the interests of federal law and clear the way for a state cause of action, since exhaustion of administrative remedies has not occurred. *See Local 926, International Union of Operating Engineers, AFL-CIO, v. Jones*, 460 U.S. 669, 680 (1983). However, the issue presented by Plaintiff to the National Labor Relations Board is not the same issue presented by Plaintiff in this lawsuit, and it is for this reason that *Garmon* preemption does not entitle Defendant to summary judgment in the case at hand.

In determining whether the National Labor Relations Act  preempts a state cause of action the "critical inquiry ... is not whether the State is enforcing a law relating specifically to labor relations or one of general application but whether the controversy presented ... is identical to ... or different from ... that which could have been, but was not, presented to the Labor Board." *Sears, Roebuck and Co. v. San Diego County Dist. Council of Carpenters*, 436 U.S. 180, 197 (1978). Although the analysis of a state law claim may involve attention to the same factual considerations as a charge before the National Labor Relations Board, such parallelism does not require *Garmon* preemption. *Lingle v. Norge Div. of Magic Chef, Inc.*, 486 U.S. 399, 408 (1988).  A state breach of contract claim is not preempted if the conduct involved is of only peripheral concern to the National Labor Relations Act and if permitting the state breach of contract claim would not frustrate any policy of the federal labor laws. *See Belknap, Inc. v. Hale*, 463 U.S. 491 (1983).

The controversy presented in Plaintiff's one-count breach of contract action is whether Defendant breached its agreement with Plaintiff, one of its full-time employees, when after terminating Plaintiff's employment it refused to allow him to utilize the peer review policy. This controversy is different from the charge presented by Plaintiff to the National Labor Relations Board and is not of the nature of a claim that could have been presented to the National Labor Relations

6

Board. While the breach of contract claim undeniably involves attention to some of the same factual considerations presented in the charge to the National Labor Relations Board, the breach of contract claim does not require any showing that Plaintiff's termination was in any way intended to interfere with, restrain or coerce  non-supervisory employees in the exercise of their organizational rights. Permitting the state breach of contract claim in this case will not frustrate any policy of the federal labor laws. The  breach of contract claim  is substantially different from the National Labor Relations Board charge and the *Garmon* preemption rule does not apply to this case.

Since the issue presented to the National Labor Relations Board is different from the issue in the case at hand, this Court also rejects Defendant's argument that Plaintiff's claim is barred by the doctrine of collateral estoppel.[3] Defendant also contends that Zavadil cannot present an issue of material fact that he was terminated for not being sufficiently anti-union. Although this Court concludes that Zavadil need not persuade a jury that he was terminated for not being sufficiently anti-union in order to prevail on his breach of contract claim, when the facts are viewed in the light most favorable to the non-moving party and that party is given the benefit of all reasonable inferences to be drawn from the underlying facts, an issue of fact exists as to whether Defendant's perception of Zavadil  not being sufficiently anti-union factored in to Defendant's decision to terminate Zavadil's employment.[4]

---

[3]Defendant relies upon the case of *Schlimgen v. City of Rapid City*, 83 F.Supp.2d 1061 (D.S.D. 2000), for its argument that Plaintiff's claim is barred by collateral estoppel. In *Schlimgen*, the district court recognized that under South Dakota law, the courts give an agency determination issue preclusive effect under the collateral estoppel doctrine if the following four criteria are met:(1) the issue decided in the former adjudication must be identical to the issue in the present case; (2) the judgment must be both final and on the merits; (3) the parties in the two actions must be either the same or in privity; and (4) the parties must have had a full and fair opportunity to litigate the issue in the former adjudication. 83 F.Supp.2d at 1068.

[4]Rebecca Stephenson, manager of Human Resources at the time Zavadil's employment was terminated testified that she believed Zavadil was promoting the Union and that he could have been, but was not, terminated for that reason. In October of 2002, Zavadil's supervisor, Simonsen, advised him that it was inappropriate to support a union. Simonson testified that Zavadil had advised him that he never supported the Union, and Simonson testified that he had never heard Zavadil speak in favor of the Union to anyone.

## II.

## WHETHER PLAINTIFF IS ENTITLED TO PARTIAL SUMMARY JUDGMENT ON THE ISSUE OF LIABILITY FOR BREACH OF THE CONTRACTUAL RIGHT TO UTILIZE THE PEER REVIEW POLICY AND PROCEDURES?

The Peer Review Policy and Procedures defines eligible employees to utilize the policy as "all full-time employees of Alcoa Extruded Construction Products, Yankton, SD, who have completed their 90-day orientation period [excluding] the facility's General Manager and all Staff personnel." Defendant does not dispute that plaintiff was one of its full-time employees who had completed his 90-day orientation period. It is also undisputed that Plaintiff was not General Manager and that he was not classified as staff personnel. Defendant still maintains that a genuine issue of material fact exists as to whether the peer review policy applied to Plaintiff. First, Defendant maintains that management never intended the peer review process to apply to salaried exempt employees. Second, Defendant maintains that the peer review policy did not apply to Plaintiff because the company believed it was under a legal obligation to terminate Zavadil's employment because it believed "Zavadil's conduct involved a blatant safety violation."

Contract interpretation is a question of law which is to be determined by the Court. *Yarcheski v. Reiner*, 669 N.W.2d 487, 495 (S.D. 2003). Whether the language of a contract is ambiguous is therefore a question of law for the Court. *Ziegler Furniture And Funeral Home, Inc. v. Cicmanec*, 709 N.W.2d 350, 355 (S.D. 2006). Furthermore "a contract is not rendered ambiguous simply because the parties do not agree on its proper construction or their intent upon executing the contract." *Ziegler*, 709 N.W.2d at 355. When a contract is clear and unambiguous, a court cannot go beyond the provisions of the contract. *Gettysburg School District 53-1 v. Larson*, 631 N.W.2d 196, 200 (S.D. 2001).

As the Court has stated in its Memorandum Opinion and Order Re: Jury Trial (Doc. 57), the eligibility section of the Peer Review Policy is not ambiguous. Defendant has not cited to any other provision within the policy or relevant amendments to the same that would warrant interpreting the Peer Review Policy to exclude from its coverage any full-time employee who had completed his orientation, other than the facility's General Manager and all staff personnel. Defendant maintains, however, that members of management did not intend and did not believe that the peer review

8

process applied to salaried, exempt employees.[5] These statements of intent, however, do not render ambiguous the clear and unambiguous language of the eligibility section of the Peer Review Policy.

Defendant also maintains that the availability of the "Resolve It" process as a method for "employees not covered by a collective bargaining agreement" to appeal adverse employment decisions establishes the intent that management employees were excluded from utilizing the Peer Review Policy.[6] Defendant fails to direct the Court to any language in either the Peer Review or Resolve It process which establishes the Resolve It process as the exclusive method for management employees to appeal adverse employment decisions. The existence of the Resolve It policy does not render ambiguous the clear and unambiguous language of the eligibility section of the Peer Review Policy. In addition, the fact that no supervisor other than Zavadil used or attempted to use the Peer Review policy does not impact the clear and unambiguous language of the eligibility section of the Peer Review Policy.

Defendant contends that one of the reasons Plaintiff's employment was terminated was his failure to support and lead Alcoa's safety program as a supervisor. Weeks prior to the termination of his employment, Plaintiff was asked where machine guarding was located for an end mill and drill press - equipment which was not at that time in use. After stating that he did not know, and when questioned again as to the location of the machine guarding, Plaintiff stated, "I don't care." At the time that he was questioned about the location of the machine guarding, Plaintiff was in the process of assisting a crew member load a 20-foot steel beam on a forklift on the plant grounds. Plaintiff has acknowledged that he used a "poor choice of words." Although Plaintiff had been unaware of the existence of the machine guards, the next morning he contacted the safety coordinator regarding the

---

[5]Although Dave Abbott, the Plant Manager from 1980 to 1996, and other members of management testified at their depositions that the peer review process was not intended to cover salaried, exempt employees, Roger Prunty, the former human resources manager at the Yankton plant, testified at his deposition that when the Peer Review Process was set up, it was intended to cover all the employees except for the Plant Manager and himself.

[6]It appears from the record that none of the employees of Defendant were covered by a collective bargaining agreement. Also, language in the Resolve It policy indicates that the Resolve It policy also applied to non-management employees. One of the questions posed and answered in the Resolve It policy is : "In issues involving an employee and a supervisor, does the company always support management?"

existence and location of the guards. After locating both guards, which apparently had not been used in some time, Plaintiff cleaned, repaired and installed the guards and informed his employees that the machines were now equipped with guards.

The Peer Review Policy provides that the Peer Review Panel cannot "[h]ear cases involving sexual harassment or when the Company is under legal obligation to act." Defendant maintains that it strongly emphasized the importance of safety and that Plaintiff's conduct involving the machine guards constituted a "blatant safety violation" that placed the company under a legal obligation to act. Defendant relies upon its handbook's provision that the company will comply with safety laws and regulations and 29 C.F.R. § 1920.212 as support for its position that the Peer Review Procedure was not applicable in light of Plaintiff's conduct.  29 C.F.R. § 1920.212 lists power presses and milling machines as "some of the machines which usually require point of operation guarding" so as "to protect the operator and other employees in the machine area from hazards such as those created by point of operation, ingoing nip points, rotating parts, flying chips and sparks." The Court concludes that this safety regulation requires neither termination of Plaintiff's employment  nor exclusion of his participation in the Peer Review process.

In consideration of Plaintiff's employment status and the unambiguous language of the eligibility section of the Peer Review  Policy and Procedures, neither the Defendant's stated intent with regard to eligibility nor Defendant's emphasis on safety precludes  Plaintiff from being entitled to partial summary judgment  on the  issue of  whether the Peer Review Policy and Procedures applied to Plaintiff. Since there is no factual dispute on the matter, Plaintiff is also entitled to partial summary judgment on the issue of whether Defendant breached Plaintiff's contractual right to utilize the Peer Review Policy and Procedures.

## III.

**WHETHER  GENUINE ISSUES OF MATERIAL FACT EXIST WITH REGARD TO WHETHER A PEER REVIEW PANEL COULD HAVE DETERMINED DEFENDANT'S POLICIES OR PRACTICES WERE  APPLIED PROPERLY AND CONSISTENTLY IN TERMINATING PLAINTIFF'S EMPLOYMENT?**

The Peer Review Policy provides that the Peer Review Panel "may review management's actions to ensure that the policy or practice was applied properly and consistently." Defendant contends that there are no genuine issues of material fact regarding whether Alcoa's policies were

10

applied properly and consistently in terminating Plaintiff's employment. Defendant also maintains that since there are no genuine issues of material fact that Alcoa's policies were applied properly and consistently in terminating Plaintiff's employment, Plaintiff is not entitled to partial summary judgment on the issue of whether Defendant breached the contract. This argument misconstrues the breach of contract issue presented in this case. The breach of contract occurred when Defendant refused to allow Plaintiff, an employee eligible for participation in the Peer Review Procedure, from utilizing the Peer Review Procedure. Whether Plaintiff can recover for that breach depends on whether he can convince a jury that a Peer Review Panel would have determined that Defendant's policies or practices were not applied properly and consistently when Defendant terminated Plaintiff's employment. *Compare with Taylor Oil Co., v. Weisensee*, 334 N.W.2d 27, 29 (S.D. 1983)(Plaintiff in legal malpractice action, in order to recover, must show in addition to negligent representation by his attorney, that he could have recovered a judgment in the absence of the negligent representation).

When viewing the evidence in the light most favorable to Plaintiff on the matter of the likely results of a timely peer review, this Court cannot conclude that the evidence is such that Plaintiff cannot recover on his breach of contract claim. Plaintiff had been employed by Defendant or its predecessor since 1979. Plaintiff was promoted to the salaried position of shift foremen and was offered, but declined, the position of maintenance manager. Throughout his employment, Plaintiff received good performance reviews and often earned excellent marks. Plaintiff never missed work, nor was he late to work. His supervisor described him as a valued partner who was loyal to the company.

On the day in December that the safety manager and director of the Environmental, Safety and Health approached Plaintiff about missing guards on the end mill and drill press, Plaintiff was in the process of assisting a crew member safely load and transport a 20-foot steel beam. Plaintiff gave the following account of what transpired when the safety manager and director of the Environmental, Safety and Health interrupted his assistance in transporting the steel beam so they could do "some kind of safety inspection:"

> So I went over with Tamara and Roland over to the drill press. And Roland asked me – he asked me where the guard was for this. And I says, "I don't know." And he jumped me again, "There's supposed to be guards on there.

11

You should know." And I said, well- I was getting frustrated and I said, "Well, I don't care." That was my response. He also said that there were no guards on an end mill. And I says I have no idea where they're at. We did not see any guards on there. I didn't know what kind of guards nor did they know what kind of guards they were looking for.

Neither the drill press nor the end mill were in use at the time Plaintiff was approached about the guards. The next morning Plaintiff met with the safety coordinator and inquired about the guards for the end mill and drill press. The safety coordinator informed him of the existence and location of the guards. Both guards were covered with dust, indicating that they had not been used in some time, and one guard was in need of repair. Plaintiff cleaned, repaired and installed the guards and informed his employees that the machines were equipped with guards.

Although this incident involving the guards occurred in December, Plaintiff heard nothing more about the incident until he was summoned over a month later by the manufacturing manager to discuss the incident. The safety coordinator at the time of the alleged safety violation testified that normally safety violations were investigated as soon as possible after the incident. Although the manufacturing manager had been asked by the plant manager to investigate the alleged safety violation, the manufacturing manager never spoke to the safety manager, the director of the Environmental, Safety and Health, or Plaintiff's immediate supervisor about the incident. There is no report of the alleged safety violation.

Three other maintenance supervisors worked for Defendant and shared equal responsibility to assure the safety of the equipment, yet none of these three maintenance supervisors was disciplined for the missing guards. Forty-nine safety violations occurred at Defendant's Yankton plant in 2002 and 2003, and none resulted in the termination of an employee's employment. Only five of these violations resulted in suspensions. These suspensions ranged from one to three days.

Although Defendant has not produced any written policy prohibiting the discussion of wage and salary information, Defendant contends it was also justified in terminating Plaintiff's employment for discussing wage and salary information. Although Plaintiff had a discussion with a fellow supervisor regarding the wages of other employees of Defendant, Plaintiff had no specific factual information and was merely speculating about their wages. The discussion took place after Human Resources released a memo explaining a new company policy regarding staggered,

12

performance-based raises.

In viewing the facts in the light most favorable to Plaintiff regarding Defendant's stated reasons for terminating Plaintiff's employment, this Court cannot conclude that there are no genuine issues of material fact surrounding the reasons given for the termination of Plaintiff's termination. Neither can this Court conclude that a jury would have no choice but to find that a Peer Review Panel conducting a timely peer review would have determined that Defendant's policies or practices were applied properly and consistently when Defendant terminated Plaintiff's employment. Since genuine issues of material fact exist regarding whether Alcoa's policies were applied properly and consistently in terminating Plaintiff's employment, Defendant's motion for summary judgment on this basis is denied.

## IV.
## WHETHER PLAINTIFF'S DAMAGES SHOULD BE LIMITED TO BACK PAY FROM THE TIME OF TERMINATION OF EMPLOYMENT UNTIL PLAINTIFF QUIT SEARCHING FOR WORK?

Defendant contends that Plaintiff's damages should be limited from January 21, 2003, the date of the termination of his employment, to December of 2004, when Plaintiff withdrew from the labor market after finding full-time employment as a building maintenance specialist at the South Dakota Human Services Center. During Plaintiff's deposition on October 19, 2005, Plaintiff was asked, "Assuming we went through the peer review process, and peer review indicated that you should have your job back, would you want your job back at Alcoa?" Plaintiff responded that he would not.[7] Defendant contends that in light of Plaintiff's obligation to mitigate his damages he should not be entitled to front pay. Plaintiff, however, is requesting that he be awarded damages either until the time that he would have been eligible to take early retirement under Alcoa's thirty years of service program, which would be in another six years, or until his statistical work life

---

[7]The record does not disclose a direct offer of reinstatement. Reinstatement may not be appropriate where hostility between the parties precludes a productive and amicable relationship. *See Denesha v. Farmers Ins. Exchange*, 161 F.3d 491, 501 (8th Cir. 1998)(discussion in ADEA case).Generally, when there is a rejection of an employer's offer of reinstatement, the reasonableness of the plaintiff's explanation for rejecting the employer's offer of reinstatement and the sufficiency of his efforts to mitigate damages are questions for the jury. *See Pacesetter Corp. v. Barrickman*, 885 S.W.2d 256, 263 (Tex. App. 1994).

13

expectancy of 62.1 years of age, which would be in another thirteen years.

After Plaintiff's employment was terminated, he went to the unemployment office and received information on how to look for jobs on the Internet. Plaintiff looked through the listings every week. Plaintiff took an hourly position with South Dakota Housing working 30 to 40 hours per week from October of 2003 until the middle of December of 2004. Defendant ultimately has the burden of proving that Plaintiff failed to mitigate his damages. *Ducheneaux v. Miller*, 488 N.W.2d 902, 918 (S.D. 1992). Defendant has not presented evidence to convince the Court to take this issue from the jury.

The measure of damages for a breach of contract is set forth in S.D.C.L. § 21-2-1 which provides:

> For the breach of an obligation arising from contract, the measure of damages ... is the amount which will compensate the party aggrieved for all the detriment proximately caused thereby, or which, in the ordinary course of things, would be likely to result therefrom. No damages can be recovered for a breach of contract which are not clearly ascertainable in both their nature and their origin.

The South Dakota Supreme Court considered the above statute in reviewing the damages awarded by the jury in *Osterkamp v. Alkota Mfg., Inc.*, 332 N.W.2d 275 (S.D. 1983), a wrongful discharge action based on the failure to follow the rules, regulations and disciplinary procedures in the Employees Handbook. In *Osterkamp,* the South Dakota Supreme Court concluded that the employee presented sufficient evidence to support the damages awarded by the jury when he presented evidence as to the salary paid by his employer, the lost income for the eleven months following the termination of his employment, his present salary, the difference between his present salary and the salary paid by his employer, and the length of his work life expectancy. 332 N.W.2d at 279.

Defendant relies on *Bad Wound v. Lakota Community Homes, Inc.*, 603 N.W.2d 723 (S.D. 1999), for its position that Plaintiff is not entitled to damages for his work life expectancy. In *Bad Wound,* the trial court limited the period of recovery for an employee's damages to the three-year term of his employment contract. The South Dakota Supreme Court, in upholding the trial court, reasoned that whether to allow a jury to consider damages beyond the contract term is an evidentiary

14

ruling, and that the ruling would be reviewed under an abuse of discretion standard. 603 N.W.2d at 724. The South Dakota Supreme Court also cited Lex K. Larson, Unjust Dismissal § 9A.02[2], for the principle that an employee working under a definite term contract, but dismissed before the expiration of such term, is entitled to damages in the form of lost wages computed from the time of discharge to the end of the contract term. 603 N.W.2d at 726. Plaintiff in this case was not working under a definite term contract, and the *Bad Wound* case is not controlling on the issue of his damages. Defendant is not entitled to summary judgment on the limitation of Plaintiff's damages.

In accordance with this opinion,

**IT IS HEREBY ORDERED** that :

(1) Plaintiff's motion for partial summary judgment (Doc. 63) is granted on the issues of whether the Peer Review Policy and Procedures applies to Plaintiff and whether Defendant breached Plaintiff's contractual right to utilize the Peer Review Policy and Procedures; and

(2) Defendant's Motion for Summary Judgment (Doc. 59) is denied in all respects.

Dated this 28th day of June, 2006.

BY THE COURT:

Lawrence L. Piersol
United States District Judge

ATTEST:
JOSEPH HAAS, CLERK
BY: _Sharon Bruro_
(SEAL)        DEPUTY

15